**STATE OF FLORIDA, ex rel. TOWN OF CRESCENT CITY,** a municipal corporation, in Putnam County, Florida, v. **THE HONORABLE SPESSARD L. HOLLAND,** as Governor of the State of Florida, and others, as and composing **THE TRUSTEES OF THE INTERNAL IMPROVEMENT FUND OF THE STATE OF FLORIDA.**

10 So. (2nd) 577            En Banc

November 17, 1942

808

810

812

814

816

818

820

822

824

WHITFIELD, J.:

An alternative writ of mandamus issued by this Court commanded the respondent Trustees of the Internal Improvement Fund of the State of Florida, having statutory authority, Chapter 20424, Acts of 1941, to make to the town conveyances of lands to which the State of Florida has absolute title under the Murphy Act for nonpayment of taxes assessed against the lands and failure to redeem under most liberal terms granted by statute.

The writ alleges:

"Whereas, by Petition filed in the name of the State of Florida upon the relation of Town of Crescent City, a municipal corporation in Putnam County, Florida, it appears that the Petitioner is entitled to have and receive of and from the State of Florida through you as Trustees of the Internal Improvement Fund a deed to certain lands lying within the corporate limits of said municipality in Putnam County, Florida, to-wit: those lands particularly described in Section II of said Petition. That it has filed its application with you therefor under Chapter 20424, Laws of Florida, 1941, and with said application has tendered the payment required by said Chapter 20424, and that it is your duty to approve said application and accept said money and issue in the name of the State of Florida a deed to said lands to the Petitioner, Town of Crescent City, a municipal corporation in Putnam County, Florida; that you have refused to and still refuse to approve said application or accept said moneys or issue said deed."

"A copy of said Petition is hereto attached and by reference is hereby incorporated into and made a part of this Writ as though the same had been set out herein in haec verba.

"Now, Therefore, we being willing that full and speedy justice be done in the premises, do command you . . . to forthwith, (a) Consider and approve the application of Petitioner of May 11, 1942, for a conveyance to the lands described in Section II of said Petition in the name of the State of Florida by you, as and composing the Trustees of the Internal Improvement Fund of the State of Florida, and (b) As

Trustees aforesaid, accept the same sum of money tendered therewith, to-wit: $50.00, and in the name of the State of Florida, and as Trustees of the Internal Improvement Fund of the State of Florida convey each and every parcel of said land to Town of Crescent City, a municipal corporation in Putnam County, Florida, agreeable to Chapter 20424, Laws of Florida, 1941, or in default thereof that you . . . show cause why you refuse so to do."

A copy of Chapter 20424 is contained in the statement.

The Attorney General answering for respondents with motion to quash avers "that on June 9, 1937, there were outstanding State tax certificates held by the State against each of the parcels of land described in the Petition filed herein by Relators which were then more than two years old, and by virtue of the provisions of Chapter 18296, Laws of Florida, Acts of 1937, the State of Florida became, on June 9, 1939, vested with the fee simple title to said lands.

Chapter 20368, Laws of Florida, Acts of 1941, deals with the proceeds derived from the sale by the State of Florida through the Trustees of the Internal Improvement Fund of lands forfeited to the State pursuant to Section 9 of the Murphy Act, being Chapter 18296, Laws of Florida, Acts of 1937, but in so doing does not declare the said lands to be held under said Murphy Act by said Trustees as other than State lands, and the interpretations by our Supreme Court of such Act have dealt with its purview and application only to the extent of adjudging its operation and effect with respect to money proceeds from the sale by said Trustees of such Murphy lands; and Chapter 20424, Laws of Florida Acts of 1941, relates to said

forfeited Murphy Act State owned lands as proper-
ties of the municipalities of the State of Florida where
such title status existed when the forfeiture under
said Murphy law to the State occurred, and treats the
forfeiture provisions of the said Murphy law to the
State of Florida as being possibly ineffective because
of such municipal ownership.

"These respondents, beliieving that such ownership
by said municipalities became legally forfeitable ex-
cept for a parity claim for tax liability existing
against such land in said municipalities with the State,
and these respondents likewise believing that the
State title over said lands, acquired by them as
Trustees of the Internal Improvement Fund of the
State of Florida, ought to be under said Legislative
Act held free from any charge against the proceeds
of their sale because of the provisions of Article XII,
Section IV of the Constitution of Florida, to the effect
that 25% of the proceeds of sales of public lands shall
be paid into the State School Fund because these
Respondents do not believe said lands to be State
lands, but rather to be forfeited tax lands. . . .

"Without waiving any of the benefits of the fore-
going Answer, these Respondents now move the Court
to Quash the Alternative Writ of Mandamus hereto-
fore issued in this cause, upon the following grounds,
to-wit:

"That for the reasons set forth in paragraph 4 of
the above and foregoing Answer the Respondents are
under no legal obligation to perform the alleged duty.

"Your Respondents, therefore, stand ready and will-
ing to abide by the Order of this Court in the
premises, and pray the Court to instruct them as to
their duties herein."

The brief of the Attorney General contains the following:

"STATEMENT OF QUESTIONS INVOLVED

QUESTION I

"Are Lands, Title to Which Became Absolutely Vested in the State of Florida Under the Provisions of Chapter 18296, Laws of Florida, Acts of 1937 (Murphy Act) "Public Lands" within the Meaning of Section 4 Article XII of the Constitution of Florida?

"Respondents contend that this question should be answered in the affirmative.

QUESTION II

"Does Chapter 20424, Laws of Florida, Acts of 1941, Require the Trustees of the Internal Improvement Fund to Convey to Municipalities in the Manner Set Forth Therein Lands, Title to Which Became Vested in the State of Florida Under the Provisions of Chapter 18296, Laws of Florida, Acts of 1937, (Murphy Act) upon the Payment of $1.00 without Reference to the Value of Such Lands?

"Respondents contend that this question should be answered in the negative. . . .

"It has been contended that lands, title to which became vested in the State under the tax laws for non-payment of taxes, have never in the past been recognized as 'public lands.' This is true, but until the passage of the Murphy Act the State never became seized of the fee simple title to tax forfeited lands free from the right of redemption. Until this Act was passed and became a law, tax forfeited lands could be redeemed at any time prior to the actual

issuance of a tax deed by the Clerk of the Circuit Court.

"Section 4 of Article XII of the Constitution of Florida was no doubt intended to provide funds for the establishment and maintenance of the public free school system in the State for the education, advancement and welfare of the children of Florida. Considering the purpose sought to be accomplished by the framers of the Constitution by including this provision therein, we do not believe that a strained construction should be placed thereon in determining what are 'public lands,' but believe that at least insofar as this provision of the Constitution is concerned all lands owned by the State subject to sale or disposition under general law and which have not been appropriated for any particular governmental purpose should be deemed and held to be 'public lands.' " . . .

"Twenty-five per cent (25%) of the sales of 'public lands' we believe, should be construed to mean 25% of a fair value of such lands. For the Trustees of the Internal Improvement Fund to follow literally the provisions of Chapter 20424, Acts of 1941, and convey to municipalities parcels of Murphy lands for the sum of $1.00 for each parcel would amount, in fact, to a donation of the 'public lands.'

"In order to protect the interest of school funds and to comply with the provisions of Chapter 20424, it is necessary for the Trustees of the Internal Improvement Fund to arrive at a fair valuation of the Murphy lands sought to be purchased by a municipality and require the payment therefor of a sum equal to 25% 'of such valuation, plus the payment therefor of a sum equal to 25% valuation, plus the sum of $1.00, as provided in Chapter 20424. The 25%

representing the interest of the State School Fund and the $1.00 representing the remaining interest of the State in such lands.

"The Trustees would not be warranted in ignoring the provision of the Constitution which placed upon them a prior trust obligation. Trustees Internal Improvement Fund v. Root, 58 So. 371, 63 Fla. 666."

Section 4, Article XII of the Constitution of 1885 provides that "The State School Fund . . . shall be derived from the following sources : . . . The proceeds of escheated property or forfeitures. Twenty-five per cent of the sales of public lands which are now or may hereafter be owned by the State."

The provision as to "forfeitures" was repealed by amended Section 9, Article XVI, of the Constitution, adopted in 1894.

"The provision of Section 9 of Article XII of the Constitution that 'the net proceeds of all fines collected under the penal laws of the State within the county' shall be a part of the county school fund to 'be disbursed by the county board of public instruction solely for the maintenance and support of public free schools,' is repealed by the amendment to Section 9 of Article XVI of the Constitution, adopted in 1894, requiring the counties to pay the legal costs and expenses of criminal prosecutions, and providing that 'all fines and forfeitures collected under the penal laws of the State shall be paid into the county treasuries of the respective counties as a general county fund to be applied to such legal costs and expenses.' " H.N. 7, Bd. Pub. Inst. Polk Co. v. Co. Com. Polk Co., 58 Fla. 391, 50 So. 574.

The words "public lands" is used in Section 4, Article VIII of the Constitution of 1868 and in Section

4, Article XII of the Constitution of 1885, have reference to open areas of land the title to which is based upon sovereign grants from the United States to Florida, and designed for general public purposes such as education, internal improvements, and drainage and reclamation, the lands being in their natural and undeveloped condition and generally in large contiguous areas  Such "public lands" include the 500,000 acres granted to the States for general internal improvement purposes by an Act of Congress approved September 4, 1841, and available to Florida upon its admission as a State in 1845, and the swamp and overflowed lands granted to the States for general drainage and reclamation purposes by Act of Congress of September 28, 1850.  The above are "public lands" within the scope, meaning and intendments of the provision of Section 4, Article XII of the Constitution of 1885, relating to sales of public lands of the State. See opinion rendered to Governor N. B. Broward, February 5, 1908, by Hon. W. H. Ellis, then Attorney-General of Florida, who for many years was a Justice of this Court, and also the opinion rendered to the Trustees of the Internal Improvement Fund, January 3, 1920, by their General Counsel, Hon. Glenn TERRELL who since May 15, 1923, has been a Justice of this Court, both of which opinions are copied in the statement filed herewith and quoted from pages 4789-90 Annotated Edition of Compiled General Laws of Florida, 1927, Compact Edition pages 44-46. *All the proceeds* from sales of the sixteenth school sections are a part of the principal of the State School Fund under Section 4, Article XII of the Constitution. Hardee v. Horton, 90 Fla. 452, 108 So. 189; So. Fla.

Farms Co. v. Goodno, 84 Fla. 532, 94 So. 672; Keech v. Enriquez, 28 Fla. 597, 10 So. 91.

The title to the public lands in Florida that are within the meaning and purpose of the organic provisions in which the words 'public lands' are used, is predicated upon the terms of the Treaty of Amity, Settlement and Limits between the United States and the Kingdom of Spain, and upon the due transfer of the ceded areas to the United States. The Treaty was ratified, confirmed and proclaimed by President James Monroe, February 22, 1821, at Washington, D. C. It cedes to the United States in full property and sovereignty all of East and West Florida with "the adjacent islands dependent on said provinces, all public lots and squares, vacant lands, public edifices, fortifications, barracks, and other buildings, which are not private property, archives and documents, which relate directly to the property and sovereignty of the said provinces, are included in this article." Pursuant to authority duly conferred, East Florida was transferred to the United States through Col. Robert Butler of St. Augustine, July 10, 1821; and West Florida was duly received and both Floridas were duly transferred to the United States through Major General Andrew Jackson at Pensacola, Florida. By virtue of three commissions issued to him by President Monroe pursuant to an Act of Congress approved March 3, 1921, Governor Andrew Jackson by Executive Proclamation dated July 17, 1821, received and accepted both East and West Florida and proclaimed that the government and authority of Spain over such ceded areas had ceased and that the government and authority of the United States was established over both East and West Florida. See

pp. 68-88, Compact Ed. C.G.L. 1927, pp. 4820-4846, Annotated Ed. C.G.L.

Upon the due ratification of the sovereign treaty and the transfer of East and West Florida to the United States in July, 1821, all the lands covered and uncovered by water, within the limits of the ceded areas, and not excepted in the Treaty of Amity, became the property of the United States "in full property and sovereignty" and subject to its government, and laws. This status continued during the Florida Territory period, 1822 to 1845; and when Florida was admitted into the Union as a State, March 3, 1845, "on equal footing with the original States," the ceded lands then belonging to the United States continued to be the property of, and subject to the laws of, the United States, except that by virtue of its sovereignty the State of Florida became the owner of all the lands under the navigable waters in the State below ordinary high water mark, in trust for the lawful purposes and uses of the people of the State, subject to the power of Congress to regulate commerce and as to post roads. The Act of Congress of March 3, 1845, admitting Florida as a State provided that the State should not interfere with the disposition of, nor tax, 'public lands' in the State while the lands remained the property of the United States.

For a brief outline of the land grants made to the Territory of Florida and to the State of Florida for various public purposes, see pages 33 et seq., C.G.L. 1927, Compact Edition, pages 4773, et seq. Annotated Edition.

Lands granted to the Territory of Florida consisting "of an entire township in each of the districts of East

and West Florida for the use of a seminary of learning"; of a quarter section for a seat of government, with other quarter sections for the same purpose; and of a quarter section in each county for "the county seat of government," were not intended to be used in kind or by sale for any other purpose.

Among the grants of land to the State of Florida were those stated in a supplemental Act of March 3, 1845, viz:

"That in consideration of the concession made by the State of Florida in respect to the public lands, there be granted to the State eight entire sections of land for the purpose of fixing their seat of government; also, section number sixteen in every township, or other lands equivalent thereto, for the use of the inhabitants of such township, for the support of public schools; also, two entire townships of land, in addition to the two townships already reserved, for the use of two seminaries of learning, one to be located east, and the other west, of the Suwannee river; also, five per centum of the net proceeds of the sale of lands within said State, which shall be hereafter sold by Congress, after deducting all expenses incident to the same; and which said net proceeds shall be applied by said State for the purposes of education.' The previous grant of two townships of land for seminaries of learning is that made to the Territory of Florida by Act of Congress approved March 3, 1823, above cited. The University of Florida at Gainesville and the State College for Women at Tallahassee are the successors of the 'two seminaries of learning, one east and the other west of the Suwannee river.' (See Chapter 5384, Acts of 1905; State v. Bryan, 50 Fla. 293, 39 So. 929; Lewis v.

Gaillard, 61 Fla. 819, 56 So. 281." Vol. 5 C.G.L. p. 4776.

"By Act of Congress of September 4, 1841, the United States granted to certain named States and to each new State thereafter admitted into the Union, five hundred thousand acres of land within their limits respectively for purposes of internal improvement. (See Section 8, c. 16, Act September 3, 1841, 5 U. S. Stats. at Large 455.) The grant was applicable to the State of Florida upon its admission into the Union, March 3, 1845. (See Chapter 94, Acts of 1847.) The title to lands under this grant passed to the State upon lists of selected surveyed lands duly approved by the Commissioner of the General Land Office and the Secretary of the Interior of the United States." See c. 610, Acts 1855, and c. 3474, Acts 1883. Vol. 5 C.G.L. p. 4778.

"An Act of Congress approved September 28, 1850, (c. 84, 9 U. S. Stats. at Large, 519), granted to the State of Florida all of the then unsold Swamp and overflowed lands in the State, the fee simple to said lands to vest in the State, upon patents issued to the State therefor subject to the disposal of the Legislature. The act provides that 'the proceeds of said lands, whether from the sale or direct appropriation in kind, shall be applied, exclusively, as far as necessary, to the purpose of reclaiming said lands by means of levees and drains.' (See Mills County v. Chicago, B.N.Q. R. Co., 107 U.S. 557, 2 Sup. Ct. Rep. 654, 27 L. Ed. 578; Trustees Internal Improvement Fund v. Root, 63 Fla. 666, 58 So. 371; United States v. Minnesota, 270 U. S. 181, 46 Sup. Ct. 298, 70 L. Ed. 539.) This grant does not include the sixteenth sections previously granted by the Act of March 3, 1845, to the

State for schools (State v. Jennings, 47 Fla. 307, 35 So. 986); nor does the grant include land under navigable bodies of water or tide lands that belong to the State by virtue of its sovereignty since March 3, 1845. (Broward v. Mabry, 58 Fla. 398, 50 So. 826; Martin v. Busch, 93 Fla. 535, 112 So. 274.) Vol. 5 C.G.L. 1927 pp. 4778-9.

Other lands were granted to the State of Florida for stated railroads consisting of "every alternate section of land designated by odd numbers for six miles in width on each side of said roads." "Indemnity lands" were also granted in lieu of lands disposed of by the United States after they had been granted to the State.

"By Chapter 610, Laws of Florida, approved January 6, 1855," (as now contained in Section 1384 (1054) et seq., C.G.L., Section 53.01 et seq., Florida Statutes 1941) "the Legislature vested in the Governor of the State and four other State officers who are now the Comptroller, State Treasurer, Attorney General and Commissioner of Agriculture, and their successors in office, in trust, so much as remained unsold of the five thousand acres of land granted by the Act of Congress of September 4, 1841, which lands became the property of the State upon its admission into the Union, March 3, 1845; also all the swamp land or lands subject to overflow granted to the State; by the Act of Congress of September 28, 1850, together with the proceeds of sales thereof, as a distinct and separate fund, to be called the Internal Improvement Fund of the State of Florida, to be applied according to the provisions of the statute. (See Trustees of Internal Imp. Fund v. Bailey, 10 Fla. 112, 125; Trustees of Internal Imp. Fund v. Root, 59 Fla. 648, 51 So. 535; Trustees of

Internal Imp. Fund v. Root, 63 Fla. 666, 58 So. 371; State of Florida v. Anderson, 91 U. S. 667, 676; Union Trust Co. New York v. Southern Inland Nav. & Imp. Co., 130 U. S. 565, 9 Sup. Ct. Rep. 606, 32 L. Ed. 1043; Railroad Companies v. Shutte, 103 U. S. 118, 26 L. Ed. 327, Littlefield v. Improvement Fund Trustees, 117 U. S. 419, 29 L. Ed. 930.) The title to swamp and overflowed land vests in the State upon delivery of a patent. (Lee Wilson & Co. v. United States, 245 U. S. 24, 38 Sup. Ct. Rep. 21 62 L. Ed. 128; Chapman & Dewey Lumber Co. v. St. Francis Levee Dist., 232 U. S. 186, 34 Sup. Ct. Rep. 297, 58 L. Ed. 564; Rogers Locomotive Machine Works v. American Emigrant Co., 164 U. S. 559, 17 Sup. Ct. Rep. 188, 41 L. Ed. 552; Byrne Realty Co. v. South Florida Farms Co., 81 Fla. 805, 89 So. 318; Everglades Sugar & Land Co. v. Bryan, 81 Fla. 75, 87 So. 68; South Florida Farms Co. v. Goodno, 84 Fla. 532, 94 So. 672; Seminole Fruit & Land Co. v. Pyles, 13 Fed. [2nd] 878.) In the other grants to the State the title is complete upon duly approved official lists of surveyed lands. As to unsurveyed lands, see Hardee v. Horton, 90 Fla. 452, 108 So. 189." Vol. 5 C.G.L. pp. 4779-80.

All the proceeds of the seminary lands, the seat of government lands, the sixteenth sections or school lands and other special grants of lands, if any, go to the specific purposes of the grants. Lands under navigable waters below ordinary high water mark belong to the State by virtue of its sovereignty for appropriate public uses and are not among the "public lands" of the State that are referred to in Section 4, Article XII, and Section 5, Article XVI of the Constitution of 1885.

The only lands granted to the State and now owned by it as "public lands" and subject to the provisions of Section 4, of Article XII, Constitution, as to the proceeds of the sales of such lands are: The Internal Improvement Lands granted under the Act of 1841, and the Swamp and Overflowed Lands granted by the Act of Congress of September 28, 1850. Title to such two classes of lands now owned by the State is in the Trustees of the Internal Improvement Fund, subject to the applicable provisions of Section 4, Article XII of the Constitution, and subject to the express statutory trusts under Chapter 610, Acts of 1855 and the amendments and additions thereto. Sec. 253.01 et seq., Fla. Stats. 1941, See Trustees I. I. Fund v. Root, 59 Fla. 648, 51 So. 535; Trustees I. I. Fund v. Root, 63 Fla. 666, 58 So. 371; Martin v. Busch, 93 Fla. 535, 112 So. 274; Apalachicola L. & D. Co. v. McRae, 86 Fla. 393, 98 So. 505; So. Fla. Farms Co. v. Goodno, 84 Fla. 532, 94 So. 672; Broward v. Mabry, 58 Fla. 398, 50 So. 826; State v. Gerbing, 56 Fla. 603, 47 So. 353; Brickell v. Trammell, 77 Fla. 544, 82 So. 221. (22 L.R.A. [N.S.] 337.)

"The terms 'public lands' or 'public domain,' which are regarded as synonymous, are habitually used in the United States to designate such lands of the United States or of the states as are subject to sale or other disposal under general laws, and are not held back or reserved for any special governmental or public purpose, and do not include lands to which rights have attached and become vested through full compliance with an applicable land law." 50 C.J. p. 886; 42 Am. Jur. P. 794, Sec. 13.

There are essential differences in the character, location and uses of the relatively large undeveloped

areas of land granted to the State for general State purposes of internal improvements and for drainage and reclamation and in the character, location and uses of the widely scattered relatively small parcels of land that have been held in private ownership and were sold to the State for nonpayment of taxes and failure to redeem, under the revenue laws of the State. The vast differences in the characteristics of the two classes of lands and in the sources and purposes of their ownership by the State are obvious.

For many years tax deeds to lands sold to the State for nonpayment of taxes and failure to redeem as allowed by statute, have been made by the State to individuals, such deeds from the State being under the statute issued by the Clerks of the Circuit Courts, and based upon statutory payments, have passed title to lands when the taxation proceedings have been complied with so as to afford due process of law. See annotations to Section 1003 (779) C.G.L. and ditto 1940 Supplement. And such lands have never been and could not reasonably be considered a part of the "public lands" or "public domain" of the State. The proceeds of the statutory sales of lands for nonpayment of taxes and failure to redeem have always been disbursed as provided by statute. Large areas of unoccupied and unimproved lands granted to the State for general State purposes of internal improvements and drainage and reclamation for cultivation and development have constituted the "public lands" of the State. The title to lands vested in the State under the Murphy Act is for failure to pay taxes or to redeem from tax sales, and the sales of such lands by the Trustees of the Internal Improvement Fund are not essentially different from other similar sales being

heretofore and now made by Clerks of the Circuit Courts. The disposition of the proceeds of such sales in either case is controlled by statute, the State being a sovereign.

The lands covered by tax sale certificates held by the State for non payment of taxes may be sold by Clerks of the Circuit Court after the tax sale certificates are two years old, with a right to redeem at any time before a tax deed is issued covering the land. Under the Murphy Act all tax sale certificates held by the State that were then more than two years old, were made subject to easy redemption or sale, with an ultimate limitation for such redemption or sale, at the expiration of which ultimate period the lands covered by the tax sale certificates *controlled by the Murphy Act* became by virtue of the statute the absolute property of the State of Florida and are sold by the Trustees rather than by the Clerks. Such immaterial differences in the administrative processes for collection of taxes levied as liens upon the lands, cannot under the Florida laws make the lands held by the State under the Murphy Act "public lands" under Section 4, Article XII, and Sections 5, Article XVI of the Constitution, when similar sales made by Clerks of the Circuit Court are not "public lands" under the organic provisions referred to.

The lands covered by the Murphy Act, Chapter 18296, Acts of 1937, are widely scattered, relatively small areas that were privately owned and described in sections or lots or subdivisions thereof. The lands are wholly unsuited for the historic and actually established purposes and uses of the "public lands" of the State. The title to the lands was vested in the State in the process of enforcing the sovereign right

of taxation with the ultimate purpose of having the lands restored to the general tax rolls, the proceeds of sales of the lands being subject to appropriate statutory regulations as contemplated by the provisions of the Constitution relating to taxation. Clearly such lands are not within the scope, meaning or intendments of the organic provision that "twenty-five percent of the sales of public lands which are now or may hereafter be owned by the State" shall be a part of the principal of the State School Fund, which Fund "shall remain sacred and inviolate" contained in Sections 4 and 5 Article XII of the Constitution. Nor are the lands held by the State under the Murphy Act subject to donation to settlers under Section 5, Article XVI of the Constitution.

The title to the unredeemed lands under the Murphy Act was by Section 9 of the statute vested in the State of Florida, not in the Trustees of the Internal Improvement Fund. Such Trustees have only the statutory authority to sell the lands and to disburse the proceeds only as directed by statutes. The authority of the Trustees in this case to sell the lands is similar to the authority of the State School Board considered in Hampton v. State Board of Education, 90 Fla. 88, 105 So. 323, 42 A. L. R. 1456. This suit is not against the State, but is to enforce a statutory duty of the Trustees to comply with Chapter 20424, Acts of 1941, not shown to be unconstitutional. See State v. Bradshaw, 39 Fla. 137, 22 So. 296; State v. Bradshaw, 35 Fla. 313, 17 So. 642.

In this case the Attorney-General contends that as heretofore the title to lands taken by the State for nonpayment of taxes has been subject to redemption, and that since under Section 9 of the Murphy Act the

title to lands covered by a stated class of tax sale certificate became absolute in the State when the ultimate time for redemption had passed and the State still held the certificates unredeemed, the lands became "public lands" of the State within the meaning of Section 4 of Article XII of the Constitution.

The State acquires title to the particular parcels of land as a part of the enforcement of its tax laws. Such lands have not been and cannot in any reasonable way be made a part of the "public lands" that are subject to donations to settlers in eighty acre tracts or otherwise used for sale or for purposes to which vacant public lands are suitable and used under the laws of the State. If the lands had been sold to purchasers by the tax collector or by the Clerk of the Circuit Court under the general tax laws and the period of redemption cut off by statute, the collection of taxes in the sale of the tax certificates by such tax collectors or the Clerk, the proceeds would have been distributed under the statutes to the taxing units having an interest in the collection for the unpaid taxes levied for such taxing units; but under the Murphy Act the sale of special classes of tax sale certificates were provided for and upon the expiration of a particular very liberal period for redemption, the inchoate title represented by the tax certificate became absolute in the State without any right of redemption, and the character of the lands and the purposes for which the lands are by statute used after being sold by the Trustees of the Internal Improvement Fund for the State, make the lands the property of the State under special circumstances which preclude the lands covered by the particular tax sale certificates from becoming a part of the public lands

of the State within the meaning and intendments of the provisions of Section 4, Article XII, or of Sections 5 of Article XVI, or of Section 26 of Article IV of the Constitution.

Any interest of different taxing units not including municipalities in the taxes covered by the certificates held by the State is a matter for legislative adjustment; and the county, districts and school funds have been many times compensated in greatly increased appropriations and allocations of State funds to counties and school and road districts for school and public road purposes; and Chapter 20424, Acts of 1941, in effect makes liberal concessions and releases to municipalities as in this case. See Secs. 192.45, 192.46 Florida Statutes 1941.

Lands granted to, or owned by, the State for purposes other than for general internal improvement and for general drainage and reclamation are for particular purposes and are not a part of the "public lands" for the purpose referred to in Section 4, Article XII, Constitution. See Land Grants, pp. 35 et seq., C.G.L., Compact Edition, pp. 4776, et seq., Annotated Edition, and 42 American Jurisprudence 794, par. 13.

For greater reason the lands formerly owned by individuals and through taxation vested in the State by the Murphy Act for nonpayment of taxes and failure to redeem are not "public lands" of the State that are subject to Section 4, Article XII, or to donations to settlers under Section 5, Article XVI of the Constitution.

The policy and wisdom of Chapter 20424, Acts of 1941, are determined by the enactment of the statute, which is not shown to violate any provision or principle of controlling organic law.

Motion to quash the alternative writ is denied.

BROWN, C. J., TERRELL, BUFORD, CHAPMAN, THOMAS and ADAMS, JJ., concur.