272 P.2d 330

**GREENE v. ESQUIBEL et al.**

**No. 5671.**

Supreme Court of New Mexico.

April 21, 1954.

Rehearing Denied June 22, 1954.

Manuel A. Sanchez, Santa Fe, for appellants.

M. A. Threet, Albuquerque, for appellee.

Ruben Rodriguez, Tax Commission Atty., Santa Fe, amicus curiae.

LUJAN, Justice.

From a judgment quieting plaintiff's title, under the description contained in his complaint, defendants' have appealed.

Plaintiff bases his title upon a tax deed issued to him by the State Tax Commissioner and the defendants Antonio J. Esquibel and Onorata L. Esquibel, his wife, base their title upon a Spanish warranty deed issued to them by Jose Emilio Salazar and Margarita A. Salazar.

Defendants urge several grounds for a reversal of the judgment, which they argue under six points, but before discussing these we shall summarize briefly the factual situation as disclosed by the record.

The land in question was patented to Jose Emilio Salazar by the United States of America, July 10, 1919, and recorded in the office of the County Clerk of Rio Arriba County, May 20, 1921. On August 3, 1938, Jose Emilio Salazar and Margarita A. Salazar, his wife, conveyed said land by a Spanish warranty deed to Antonio J. Esquibel, one of the defendants, now deceased. Mr. Esquibel did not render said property for taxes for the years 1937, 1938, 1939 and 1940, although the same was subject to taxation. It continued to be assessed in the name of Jose Emilio Salazar. None of the defendants paid any taxes on the property for the years 1937, 1938, 1939 and 1940. On January 20, 1942, the property was sold for the delinquent taxes for the year 1937 to the State of New Mexico. It not having been redeemed within two years as provided by law a tax deed was issued by the County Treasurer of Rio Arriba County to the State of New Mexico, under date of July 23, 1946. On December 20, 1950, the State Tax Commission conveyed the property by

tax deed to the plaintiff, E. W. Greene, which deed was filed for record on January 15, 1951, with the County Clerk of Rio Arriba County. On March 26, 1952, the State Tax Commission issued to the plaintiff a correction deed, which appears of record in Book 35, page 278, of the records of Rio Arriba County.

Under defendants' point one the plea of adverse possession of ten years is attempted to be sustained by showing that the defendant, Antonio J. Esquibel, had been in possession and actual occupation of the land for more than ten years prior to the filing of the complaint herein, to-wit: From August 3, 1938, to the time of his death on May 31, 1951, a date subsequent to the institution of this suit. This claim is without merit. The general rule is stated in 2 C.J., Adverse Possession, § 162, as follows:

> "Where, during the running of the statute of limitations in favor of the adverse occupant of land, the land is forfeited to the state for taxes, the general rule is that continuity of possession is interrupted for the reason that the statute of limitations does not run against the state in the absence of some special provision to that effect." See also 2 C.J.S., Adverse Possession, § 152.

In the case at bar the State of New Mexico owned the land from the year 1946 until it was sold to W. E. Greene in 1950, and adverse possession did not run during the time the State was the owner of the property; and ten years had not elapsed since the state parted with title in favor of the plaintiff. See, Burgett v. Calentine, 56 N.M. 194, 242 P.2d 276; Pratt v. Parker, 57 N.M. 103, 255 P.2d 311.

Under point two it is argued that the county treasurer was guilty of constructive fraud in advising Antonio J. Esquibel's predecessors in title that the property involved herein was free and clear of taxes for the years 1937 and 1938, and that sale of the property for taxes and all subsequent deeds issued pursuant to sale are void. The charge of fraud is one easily made, and the burden is upon the party alleging it to establish its existence, not by doubtful and inconclusive evidence, but clearly and conclusively. Fraud cannot be presumed. It must be proved by clear and satisfactory evidence. It is true that fraud need not be proved by positive and direct evidence, but may be established by facts and circumstances sufficient to support the conclusion of fraud. But whether it be shown by direct and positive evidence, or established by circumstances, the proof must be clear and convincing, and such as to satisfy the conclusion of the chancellor, who should be cautious not to lend too ready an ear to the charge.

Frear v. Roberts, 51 N.M. 137, 179 P.2d 998.

The court found:

"That the defendants have failed to prove by a preponderance of the evidence that at the time Antonio J. Esquibel purchased the property in suit from Jose Emilio Salazar, or at any other time subsquent thereto, that he inquired of the County Treasurer of Rio Arriba County, New Mexico, as to any other taxes that might be unpaid or that he offered to pay any other unpaid taxes, upon the property in suit."

Based upon said finding the court concluded as a matter of law:

"That neither the County Treasurer of Rio Arriba County, nor his deputy, were guilty of any actual or constructive fraud upon the defendants, or either of them."

 We will not review the evidence; suffice it to say that we have scanned all of the evidence appearing in the record and believe that there was a substantial conflict as to whether or not Antonio J. Esquibel and Jose Emilio Salazar called at the Treasurer's office and were by him informed that there were no taxes due on the land involved herein for the years 1937 and 1938. This being so, it was for the trier of the facts to determine its weight, and also the credibility of the witnesses and it is not the duty of this court to do so. Kilpatrick v. State, 58 N.M. 88, 265 P.2d 978, and cases cited. It has been repeatedly held by this court that where there is a substantial conflict in the evidence the verdict of the jury or the findings of the court will not be disturbed unless error of law occurred upon the trial. Kilpatrick v. State, supra.

 It is next contended that the assessment was void for the reason that the property was not assessed in the school district where it was located and that the tax sale and all subsequent deeds issued pursuant thereto are void. We are unable to agree with this contention. Section 76-203 of 1941 Comp., provides:

"Every person, firm, association or corporation shall, in each year, make a declaration of all property subject to taxation of which he is the owner * * * together with a statement of the *county* in which the property is situated on which it is liable for taxation, and a description of all real estate, such as would be sufficient in a deed to identify it so that title thereto would pass, * * *." (Emphasis ours.)

The tax is not a district tax. It is a county tax, levied equally and uniformly upon all taxable property *in the county*. It is a general *county tax,* not levied by

districts, but spread generally, over all taxable property. Raynolds v. Swope, 28 N. M. 141, 207 P. 581. The location and identity of the property is a question for the trier of the facts. The school district need not have been placed on the assessment roll; there is nothing in the above section that requires the owner of the property or the taxing officials to designate the school district wherein the property is located; and had it not been there, the sale would have been free from the question now made. The notation on the tax roll, indicating that the land was in a particular school district, was not an essential part of the listing of the property for taxation, and did not affect the validity of the tax sale, though the land was not in fact in such school district. A school district is a part of the county's territory divided for taxation for school purposes.

It is further contended that the taxing authorities committed fraud (constructive) in providing erroneous addresses for Jose Emilio Salazar and thus preventing him from receiving proper notice of his assessment, and, therefore, the tax sale and all subsequent deeds issued pursuant thereto were void. We do not agree with this contention. If a valid assessment and levy had been made of the taxes, the county treasurer's failure to give a proper notice would not invalidate the tax sales. That like various other duties enjoined by statute, can only be regarded as directory to the officer; the neglect to give a proper notice or failure to give any notice at all would not discharge the tax, or present a valid obstacle to the collection thereof.

Section 76–402, 1941 Compilation, provides:

"After the receipt of said assessment roll by the county treasurer, he shall, by letter or post card, addressed, stamped and mailed, notify each taxpayer of the amount of his tax, *but the failure to give such notice shall not invalidate* the assessment, levy, judgment *or sale,* or any proceedings taken for the collection of taxes." (Emphasis ours.)

The requirement that the county treasurer give written notice to each taxpayer of the amount of his tax adds nothing to the definite imposition of the tax and the equally definite imposition of a penalty to follow upon delinquency. This provision is directory, but not mandatory. It is intended for the benefit and convenience of the taxpayer, but certainly not for his relief or advantage.

It is also claimed that the tax deed from the State Tax Commission to the plaintiff is void for the reason that it was issued more than ten years after the delinquency of the taxes involved in the tax sale. The record does not bear out

this claim. The property was sold for delinquent taxes on January 20, 1942, which was less than five years from the date of delinquency of the 1937 taxes. Tax sale certificates were duly issued to the State of New Mexico, subject to the right of redemption. The property was not redeemed, and on July 23, 1946, the Treasurer issued a tax deed conveying the property involved herein to the State of New. Mexico.

The defendants rely on Section 76–634 of 1941 Compilation, as authority to prevent the State Tax Commission from selling property acquired at delinquent tax sales if the State Tax Commission holds title to the property for a period more than ten years after date of delinquency. We are unable to see how this section is applicable to the case at bar. It only provides that taxes delinquent for more than ten years are presumed to have been paid and prohibit proceedings to be brought for the collection of taxes delinquent for more than ten years from the date of the institution of the action.

Section 76–718 of 1941 Compilation, provides:

"Tax sale certificates may be issued, sold or assigned and tax deeds procured by the holders of tax sale certificates at any time within ten (10) years after the tax upon the basis of which such tax certificates were issued became delinquent, and not afterwards; * * *."

Only eight years had elapsed from the date the 1937 taxes became delinquent to the time a tax deed was issued by the county treasurer to the State of New Mexico.

■ The record shows that the property was sold for delinquent taxes on January 20, 1942, which was less than five years from the date of delinquency of the 1937 taxes. The tax sale certificates were duly issued to the State of New Mexico, subject to the right of redemption, and on July 23, 1946, tax deeds were duly issued to the State.

Section 76–725 of 1941 Compilation, provides:

"As to real property which . has been deeded to the state, or which may hereafter be deeded to the state for unpaid taxes, the county treasurer shall mark the tax rolls opposite the assessment of such property, for each year in which taxes on such property appear unpaid, for a period of ten (10) years back from the date of delinquency of the current taxes, as follows: 'paid by deed No. ———— to State,' filling in the respective deed number covering said property. Said treasurer shall take credit on his books for the amount of taxes shown paid by issuance of tax

deed to the state, and the county clerk shall show credit to the treasurer therefor on his books."

Under the provisions of the above section, the ten year period dates back from the date of delinquency of the 1937 taxes. Therefore, all taxes were presumed to have been paid for a period of ten years prior thereto.

Pursuant to the County Treasurer's deed the State acquired a fee simple title to the property. Hargrove v. Lucas, 56 N.M. 323, 243 P.2d 623. And the only right defendants had after the title vested in the State was a preferential right to repurchase the land as provided for under Section 76–740 of 1941 Compilation. See, De Baca v. Perea, 52 N.M. 418, 200 P.2d 715. Under the deed from the State Tax Commission the plaintiff acquired a new, independent and paramount title to the property involved herein. Zaring v. Lomax, 53 N.M. 273, 206 P.2d 706.

Defendants further contend that title never vested in the State of New Mexico under Section 76–724 of 1941 Compilation, and that the State merely held the land in question in lieu of tax money, and for such reason had no power or authority to sell the land to plaintiff after the expiration of the ten year period from the date of delinquency. We entertain a different view. It is true that the State Tax Commission had acquired the property at delinquent tax sale for the benefit of the State, and other taxing units that may have had an interest in the delinquent taxes for which the property was sold. But in administering the property for the benefit of the State and other taxing units, the statute specifically provides that the State Tax Commission shall have power and authority to dispose of the property and distribute the proceeds of the sale to the State and the various taxing units which may have an interest in the delinquent taxes. Section 76–745 and 76–752 of 1941 Compilation. That is precisely what the State Tax Commission did.

The defendants further contend that "upon the sale of the land involved herein to the State of New Mexico, for non-payment of taxes, the land became 'public lands'; that under the provisions of Article 13, Sections 1 and 2 of the New Mexico Constitution, the sole power of disposal of said land is in the Commissioner of Public Lands of the State of New Mexico; and that the State Tax Commission had no power or authority to sell the land to appellee, and that the sale of said State Tax Commission and the deed to appellee is void."

Are lands, title to which became vested in the State of New Mexico for nonpayment of taxes, "public lands" within the meaning of Section 1 of Article 13 of the

Constitution of New Mexico, which reads as follows:

"§ 1.—All lands belonging to the Territory of New Mexico, and all lands granted, transferred or confirmed to the state by congress, and all lands hereafter acquired, are declared to be public lands of the state to be held or disposed of as may be provided by law for the purposes for which they have been or may be granted, donated or otherwise acquired; provided, that such of school sections two, thirty-two, sixteen and thirty-six as are not contiguous to other state lands shall not be sold within the period of ten years next after the admission of New Mexico as a state for less than ten dollars per acre."

By the Act of June 21, 1898, known as the Ferguson Act, 30 Stat. 484. Congress made numerous grants of land for various purposes to the territory of New Mexico. Some of these were of specific lands, and others were of lands to be selected. By the Enabling Act, Act of June 20, 1910, 36 Stat. 557, certain new and supplemental grants were made to the state for named purposes, and the previous grants to the territory were confirmed and expressly transferred to the state. It was therein provided that all such lands, including previous grants, "shall be by the said State held in trust, to be disposed of in whole or in part only in manner as herein provided and for the several objects specified in the respective granting and confirmatory provisions, and that the natural products and money proceeds of any of said lands shall be subject to the same trusts as the lands producing the same." Section 28. It was further provided that the disposition of any of said lands, or of any money or thing of value directly or indirectly derived therefrom, for any other or different purposes than that specified, should be deemed a breach of trust; that separate funds should be established for the several objects of the grants; and that money in any manner derived from any of the lands should be deposited in the fund corresponding to the grant; that no money should be taken from one fund for deposit in any other, or for any object other than that for which the land producing it was granted; that all such moneys should be safely invested; * * * that the state and its people should consent to all said provisions by ordinance made, by proper reference, a part of the Constitution and by its terms precluding the making, by constitutional amendment, of any change in or abrogation of such ordinance without the consent of Congress.

If lands, title to which is acquired in the name of the State of New Mexico by virtue of nonpayment of taxes are "public lands", they become such by that portion of Section 1 of Article 13 which reads: "and all lands hereafter acquired". However, we believe that the framers of the

Constitution, and the people that adopted it, intended that the term "public lands" be limited to lands, acquired in a proprietary capacity.

 The fundamental principle of constitutional construction is to give effect to the intent of the framers of the organic law and of the people adopting it. A constitutional clause must be construed reasonably to carry out the intention of the framers, which gives rise to the corollary that it should not be construed so as to defeat the obvious intent if another construction equally in accordance with the words and sense may be adopted which will enforce and carry out the intent. The intent must be gathered from both the letter and spirit of the document. It has been very appropriately stated that the polestar in the construction of Constitutions is the intention of the makers and adopters. 11 Am.Jur. § 61 pages 674, 675.

 The framers of the New Mexico Constitution and the people who adopted it, could not have had tax property in mind in connection with the above article. At that time no title to such lands was acquired in the name of the State. The collection of delinquent taxes was handled solely on a county level, the county acquiring title to lands sold for nonpayment of taxes. Section 22 of Chapter 22, Session Laws of 1899, provided, in part:

" * * * but if there should be no purchaser, in good faith, for the same on the first day, the property is offered for sale, when the property is thereafter offered for sale, and there is no purchaser in good faith bidding upon the same, the whole amount of the property assessed shall be struck off to the county as the purchaser, and the duplicate certificate delivered to the county treasurer and filed by him in his office, after having the same recorded in the office of probate clerk of said county, * * *."

The above statute was in effect at the time of the adoption of the Constitution. It was not until many years after the adoption of the Constitution that the Legislature provided a tax sale procedure whereby title to tax property should be taken in the name of the State.

Defendants further contend that, upon sale of the lands in question to the State of New Mexico for nonpayment of taxes, they became public lands and that the sole power of disposal of the same under the Constitution is in the Commissioner of Lands and not in the State Tax Commission. We are unable to agree with this contention.

In 11 Am.Jur. § 63, page 677, the author says:

"Constitutions, like statutes, are properly to be expounded in the light of conditions existing at the time of

their adoption, the general spirit of the times, and the prevailing sentiments among the people."

The legislature some twenty years ago saw fit to have the title to property sold for nonpayment of taxes taken in the name of the State and be administered by the State Tax Commissioner. This practice has long been acquiesced in.

In 11 Am. Jur. § 80, p. 701, we find the following language:

"A practical construction acquiesced in for many years, although not truly contemporaneous with the adoption of the Constitution, is frequently resorted to interpreting its provision and may be sufficient to demonstrate that powers conferred by a statute are not inconsistent with the provisions of the fundamental law. The established practical construction of a constitutional provision should not be disregarded unless the terms of the provision furnish clear and definite support for a contrary construction."

See, also, 11 Am.Jur. Section 79, pages 699 and 700.

As above stated we are of opinion that when the framers of the constitution used the phrase "and all lands hereafter acquired", they had reference to additional land grants which might be made or to other lands acquired in a proprietary ca-

pacity and not to lands acquired by the state in tax proceedings, as here. We are also of the opinion that lands, the title to which become vested temporarily in the state through tax proceedings were not grants to the state, or lands thereafter acquired as contemplated by the constitution, and that title thereto is now taken in the name of the state, instead of in the name of the county as was formerly the case, only for the better and more uniform method of disposition, to the end that they may be sold and the money they represent be promptly remitted to the agencies for which the taxes were assessed and such lands restored to the tax rolls as speedily as possible. It was never intended that title thereto vest in the state in its proprietary capacity.

That property acquired by the State for nonpayment of taxes is not public land within the purview of the Constitution apparently has been the general conclusion of courts of other states under similar circumstances based upon practical considerations. Arizona Title Guarantee & Trust Co. v. State, 60 Ariz. 555, 142 P.2d 212; Pinal County v. Pomeroy, 60 Ariz. 448, 139 P.2d 451; Murphy v. State, 65 Ariz. 338, 181 P.2d 336; Longview Co. v. Cowlitz County, 1 Wash.2d 64, 95 P.2d 376; and State ex rel. Town of Crescent City v. Holland, 151 Fla. 806, 10 So.2d 577.

Holdings in sister states are shown by the following citations. In Arizona Title Guar-

antee & Trust Co. v. State, supra [60 Ariz. 555, 142 P.2d 213], it is stated:

"The requirements of section 1 of Article X that: 'All lands expressly transferred and confirmed to the state by the provisions of the Enabling Act approved June 20, 1910, including all lands granted to the state and all lands heretofore granted to the territory of Arizona, *and all lands otherwise acquired by the state,* shall be by the state accepted and held in trust to be disposed of in whole or in part, only in manner as in the said Enabling Act and in this constitution provided, and for the several objects specified in the respective granting and confirmatory provisions. The natural products and money proceeds of any of said lands shall be subject to the same trusts as the lands producing the same', and of section 3 that before any such lands may be sold or disposed of they must be advertised for ten weeks, clearly were intended to apply to lands acquired and held by the state in its proprietary capacity and not the lands acquired by the state in tax foreclosure proceedings, as here.

\* \* \* \* \* \*

"Under this holding the tax title acquired by the state becomes vested in the state, not in its proprietary capacity but in trust for the state and for the other taxing municipalities or units within which the land is situated, with the power and obligation on the part of the state to sell the land and fairly apportion the proceeds to the state, municipal and other funds entitled thereto. We think this is decisive of the question here raised. Lands, the title to which became vested temporarily in the state through tax proceedings, are not grants to the state, nor does the state 'acquire' title thereto except in its governmental capacity as a tax collector." (Emphasis ours.)

In Pinal County v. Pomeroy, supra [60 Ariz. 448, 139 P.2d 454], the court said:

"The state, in taking title to the property for the nonpayment of the taxes, acted solely in aid of the taxing authorities in collecting taxes against the property and for that purpose took the title to the property in its governmental capacity, and not as proprietor. Christmas Copper Corp. v. Kennedy, 58 Ariz. 216, 118 P.2d 1110. \* \* \*"

In Murphy v. State, supra [65 Ariz. 338, 181 P.2d 352], the court stated:

"The phrase 'and all lands otherwise acquired by the state' appearing in sections 1 and 9 of article 10 of the Constitution are not all inclusive. These words 'and all lands otherwise

acquired by the state' refer to lands otherwise acquired by the state for the uses and benefits of the trust which was set up to create permanent funds for the support and maintenance of the institutions referred to in the Enabling Act. * * *

"By the Enabling Act, Congress attempted to create a continuing trust to provide funds, and effectively accomplished its purpose. Section 1 of article 10 of the Constitution is practically a rescript of the first paragraph of section 28 of the Enabling Act with the addition 'and all lands otherwise acquired by the state.' The framers of the Constitution might reasonably have contemplated that the federal government would make additional grants for the identical uses and purposes specified in the Enabling Act. They just as reasonably could have anticipated that the state would provide for additions to the trust fund, as it did by the enactment of sec. 95, ch. 5, Laws 1915, 2nd S.S., * * *."

In Longview Co. v. Cowlitz County, supra [1 Wash.2d 64, 95 P.2d 379], the Washington Supreme Court said:

"* * * when the county becomes the purchaser of land at a general tax foreclosure sale for want of other bidders, the county, upon the deed being issued to it pursuant to such sale, acquires title to such property in fee, as against the owner. However, the title thereby acquired becomes vested in the county, not in its proprietary capacity, but in trust for the state and for the other taxing municipalities within which the land is situated, with power and obligation on the part of the county to sell the land and fairly apportion the proceeds to the state, municipal, and other funds entitled thereto, * * *."

In State ex rel. Town of Crescent City v. Holland, supra, one of the questions before the court was whether lands, title to which became absolutely vested in the State of Florida, by virtue of tax sale procedure were "public lands" within the meaning of the Constitution of that state. The constitution of Florida provided that 25% of the sales of public land, which are now or may hereafter be owned by the state should go to the state school fund. The court said [151 Fla. 806, 10 So.2d 587]:

"* * * The words 'public lands' as used in section 4, Article VII of the constitution * * * have reference to open areas of land the title to which is based upon sovereign grants from the United States to Florida, and designed for general public purposes such as education, * * * the lands being in their natural unde-

veloped condition and generally in large contiguous areas.

\* \* \* \* \* \*

There are essential differences in the character, location and uses of the relatively large undeveloped areas of land granted to the State for general State purposes \* \* \* and in the character, location and uses of the widely scattered relatively small parcels of land that have been held in private ownership and were sold to the State for nonpayment of taxes and failure to redeem, under the revenue laws of the State. The vast differences in the characteristics of the two classes of lands and in the sources and purposes of their ownership by the State are obvious.

"For many years tax deeds to lands sold to the State for nonpayment of taxes and failure to redeem as allowed by statute, have been made by the State to individuals, such deeds from the State being under the statute issued by \* \* \* and based upon statutory payments, have passed title to lands when the taxation proceedings have been complied with so as to afford due process of law. \* \* \* And such lands have never been and could not reasonably be considered a part of the 'public lands' or 'public domain' of the State. The proceeds of

the statutory sales of lands for non-payment of taxes and failure to redeem have always been disbursed as provided by statute.

\* \* \* \* \* \*

"The title to the lands vested in the State in the process of enforcing the sovereign right of taxation with the ultimate purpose of having the lands restored to the general tax rolls, the proceeds of sales of the lands being subject to appropriate statutory regulations as contemplated by the provisions of the constitution relating to taxation. Clearly such lands are not within the scope, meaning or intendments of the organic provision that 'twenty-five per cent. of the sales of public lands which are now or may hereafter be owned by the State'.

\* \* \* \* \* \*

"The State acquires title to the particular parcels of land as a part of the enforcement of its tax laws. Such lands have not been and cannot in any reasonable way be made a part of the 'public lands' that are subject to donations \* \* \* or otherwise used for sale or for purposes to which vacant public lands are suitable and used under the laws of the State.

\* \* \* \* \* \*

"For greater reason the lands formerly owned by individuals and

through taxation vested in the State by the Murphy Act for nonpayment of taxes and failure to redeem are not 'public lands' of the State that are subject to section 4, Article XII * * * of the constitution."

It follows from what has been said that lands acquired by the State for nonpayment of taxes are not to be considered as being "public lands" within the scope and meaning of Section 1 of Article 13 of the Constitution, to be held in trust for the uses and benefits contemplated by the Enabling Act and other acts of Congress. Nor are they such lands as are to be administered by the Commissioner of Public lands.

 Claim is also made that the trial court erred in making certain findings of fact and conclusions of law as well as in refusing to make certain requested findings and conclusions. In reviewing the record the evidence will be considered in the light most favorable to the appellee disregarding all evidence to the contrary. Mobley v. Garcia, 54 N.M. 175, 217 P.2d 256, 19 A.L.R.2d 553. We have carefully examined the record and cannot escape the conclusion that there is substantial evidence to sustain the findings of the trial court as well as the conclusions of law based upon said findings, and under the well established rule they will not be disturbed.

The requested findings are a challenge to the sufficiency of the evidence to sustain the findings made by the court. It is sufficient to say that the court could not make the findings and conclusions requested because they would be inconsistent with the findings and conclusions which the court did make upon the facts adduced at the trial.

We find no error in the record, and for the reasons stated the judgment of the lower court will be affirmed.

It is so ordered.

McGHEE, C. J., and S A D L E R, COMPTON and SEYMOUR, JJ., concur.

On Motion for Rehearing

PER CURIAM.

 The motion for rehearing will be denied; at the same time the following statement is made for the purpose of clarification: This decision does not decide nor does it determine that all lands held by the State in a proprietary capacity are comprehended within the terms of Section 1, Article 13, of the Constitution of New Mexico.

McGHEE, C. J., and SADLER, COMPTON, LUJAN, and SEYMOUR, JJ., concur.